FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Nov 29, 2018

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BARBARA DAVIS, as Personal Representative of the Estate of G.B., deceased, | No.   2:18-CV-00194-SMJ |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS STOKES AND KIRKLAND'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES; TOM STOKES, individually and in his official capacity, and the marital community comprised thereof; JEREMY KIRKLAND, individually and in his official capacity and the marital community comprised thereof; JANE DOE STOKES, and the marital community comprised thereof; and JANE DOE KIRKLAND, and the marital community comprised thereof, | |
| Defendants. | |

This case involves the tragic death of a five-year-old boy, G.B., who was allegedly abused and killed by his aunt after the Washington State Department of Social and Health Services ("DSHS") placed him in her custody. G.B.'s grandmother, Plaintiff Barbara Davis, brought this action alleging several 42 U.S.C.

§ 1983 claims and state law claims against DSHS and its employees, Defendants Tom Stokes and Jeremy Kirkland. ECF No. 1-2. This is Davis's second lawsuit against DSHS and its employees. *See Davis v. Strus*, No. 2:17-cv-00062-SMJ (E.D. Wash.). Davis omitted Stokes and Kirkland from her first lawsuit. *See id.*

Before the Court is Stokes and Kirkland's Motion for Summary Judgment, ECF No. 13. The parties agree the Court should dismiss Davis's § 1983 claims against Stokes and Kirkland in their official capacities. ECF No. 13 at 4; ECF No. 23 at 4.[1] But the parties dispute whether the Court should do the same for Davis's § 1983 claims against Stokes and Kirkland in their individual capacities. The Court held a hearing regarding the motion on October 30, 2018. ECF No. 52. Having reviewed the file and relevant legal authorities, the Court grants the motion in part because the undisputed facts do not establish that Stokes and Kirkland acted with deliberate indifference to a known or obvious danger to G.B. The Court denies the motion in part as to all other relief Stokes and Kirkland seek.

## BACKGROUND

Heidi Kaas was a DSHS social worker from 1998 to 2015. ECF No. 15 at 3. During that time, she attended over 100 trainings, including six weeks of Social

---

[1] State officials acting in their official capacities are not persons subject to suit under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Accordingly, the Court grants summary judgment in favor of Stokes and Kirkland on Davis's § 1983 claims against them in their official capacities.

Worker Academy and many trainings on child safety, child dependency, family assessments, and shared and permanency planning. *Id.* Between February 2007 and June 2014, she attended twelve trainings specific to DSHS policies. *Id.* at 5.

Kaas worked at the DSHS office in Port Angeles, Washington. ECF No. 17 at 2. By August 2014, she was one of the more experienced social workers in the Port Angeles DSHS office, having performed her job for over fifteen years. *Id.*

Kaas was G.B.'s primary social worker from June 2011 to mid-December 2014. *Id.* G.B. initially came to DSHS's attention in May 2011. ECF No. 1-2 at 3; ECF No. 56 at 2. He was a member of the Hoh Tribe. ECF No. 17 at 3. He had a younger brother and younger half-sister. ECF No. 1-2 at 3–4; ECF No. 56 at 2. G.B.'s father died in June 2012. ECF No. 1-2 at 3; ECF No. 56 at 2. G.B.'s mother died in July 2014. ECF No. 14 at 2.

In April 2014, before G.B.'s mother died, Kaas began speaking with G.B.'s paternal aunt, Cynthia Khaleel, about whether her home could serve as a placement for the children. ECF No. 17 at 2; ECF No. 25-5 at 6–7. After some April 2014 visits with the children in Port Angeles, Khaleel agreed. ECF No. 17 at 2. Kaas documented both her contact with Khaleel and Khaleel's visits with the children. ECF No. 17 at 2; ECF No. 25-5 at 6–7. Kaas told another social worker that, in July 2014, she conducted a walkthrough of Khaleel's home in Chattaroy, Washington to

determine whether G.B. and his siblings could be placed there.[2] ECF No. 16 at 6; ECF No. 25-6 at 5.

On August 1, 2014, the dependency court ordered that G.B. have an extended visit with Khaleel in Chattaroy. ECF No. 17 at 3. The Hoh Tribe was involved in G.B.'s dependency and approved his extended visit with Khaleel. *Id.*

On September 3, 2014, the dependency court found Khaleel's Chattaroy home to be "an appropriate placement that adequately meets all [G.B.'s] . . . physical, emotional, cultural, and educational needs," held there was "a continuing need for out-of-home placement for [G.B.] and it would be contrary to [G.B.'s] welfare to return home," and ordered that G.B. be placed with Khaleel in Chattaroy. ECF No. 16 at 3 (alterations and omission in original). Chattaroy is in the Spokane County DSHS area, outside the Clallam County DSHS area embracing Port Angeles. *See* ECF No. 36 at 12; ECF No. 56 at 5. On the date the dependency court ordered that G.B. be placed with Khaleel, he was already in her Chattaroy home on a court-ordered extended visit. ECF No. 17 at 3.

Kaas documented conducting required monthly health and safety visits with

_____

[2] In April 2008, DSHS received a referral alleging that Khaleel's two-year-old son was outside the home unattended. ECF No. 25-23 at 2. DSHS investigated that neglect referral and deemed it unfounded. ECF No. 25-17 at 12; ECF No. 25-18 at 2. In November 2013, DSHS received a referral alleging that a two-year-old child Khaleel was babysitting jumped on a bed and fell through a screened but open window. ECF No. 25-23 at 7–8; ECF No. 25-24 at 14–15. DSHS investigated that neglect referral and deemed it unfounded. ECF No. 25-24 at 15.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS STOKES AND KIRKLAND'S MOTION FOR SUMMARY JUDGMENT **- 4**

G.B. in Port Angeles in May, June, July, August, September, and December 2014, and in Chattaroy in October and November 2014. ECF No. 16 at 2–5; ECF No. 17 at 2–3. During those months, Kaas documented no safety concerns for G.B. ECF No. 16 at 2–5; ECF No. 17 at 2–3.

Sarah Oase supervised Kaas from 2012 to August 30, 2014. ECF No. 17 at 2. Defendant Jeremy Kirkland supervised Kaas from September 1, 2014 to mid-December 2014. ECF No. 16 at 2. As the Area Administrator for the Clallam County DSHS area, including Port Angeles, Defendant Tom Stokes supervised Oase then Kirkland in 2014 and 2015. ECF No. 19 at 2.

Though Kaas was one of the more experienced social workers in the Port Angeles DSHS office, ECF No. 17 at 2, in August 2014, Stokes asked Oase to document Kaas's failure to timely complete court reports. ECF No. 19 at 3. Kaas told Oase that she often traveled to the Spokane County DSHS area and would continue conducting required monthly health and safety visits with G.B. in Chattaroy. ECF No. 17 at 3.

Kirkland began supervising Kaas one month after the dependency court ordered G.B. on an extended visit with Khaleel and just two days before the dependency court ordered that G.B. be placed with Khaleel. ECF No. 16 at 2–3. In his declaration, Kirkland states that before he began supervising Kaas, he did not know G.B. was on her caseload. *Id.* at 3. At his deposition, Kirkland testified that

during the supervisor transition, Oase told him Kaas had "what's called a PMR, which is kind of a disciplinary record," and had "issues . . . with health and safety visits and documentation and filing." ECF No. 25-21 at 6. Kirkland elaborated that Kaas's "[d]ocumentation wasn't always input timely into [the DSHS database]." *Id.* Kirkland testified that when he began supervising Kaas, he did not "know of any concerns that she was just making up visits or that they didn't occur even though she wrote them down"; the concerns were "[j]ust timeliness and then filing was an issue and making referrals on time for clients to services." *Id.*

Kirkland held required monthly supervisor meetings with Kaas on September 4 and October 15, 2014. ECF No. 16 at 3–4. Each time, Kaas voiced no safety concerns for G.B. *Id.* Sometime after their October 15, 2014 meeting, Kirkland noticed that Kaas documented conducting required monthly health and safety visits both with G.B. and his younger brother in Chattaroy, and with his younger half-sister in Port Angeles, on October 6, 2014. *Id.* at 4. Given the distance between the two towns, Kirkland asked Kaas about her documentation. *Id.* She said she must have made an error when documenting those visits. *Id.* Kirkland accepted Kaas's explanation and did not then suspect she was falsifying her case notes. *Id.*

Kirkland held another required monthly supervisor meeting with Kaas on November 21, 2014. *Id.* at 4. Again, Kaas voiced no safety concerns for G.B. *Id.* Kaas had documented conducting a required monthly health and safety visit with

G.B. in Chattaroy earlier that month and identified no safety concerns for him. *Id.*

Kirkland then received information that Kaas might be falsifying her case notes. *Id.* at 5. He reviewed her files, including her documented health and safety visits. *Id.* Kirkland showed Kaas her case notes documenting visits with G.B. and his siblings on the same date. *Id.* Kaas admitted to Kirkland that she falsified those case notes and did not see G.B. in October 2014. *Id.*

In November or December 2014, Kirkland gave the information he gathered regarding Kaas to his supervisor, Stokes, who launched an investigation. *Id.*; ECF No. 19 at 3; ECF No. 25-21 at 11. Before that time, Stokes did not suspect Kaas was falsifying her case notes. ECF No. 19 at 3. In mid-December 2014, Stokes removed Kaas from all casework and her employment ended sometime in 2015. ECF No. 19 at 3.

Before Stokes reassigned her, Kaas documented conducting a required monthly health and safety visit with G.B. in Port Angeles on December 5, 2014, noting "no safety concerns with any of these three siblings" or with Khaleel. ECF No. 16 at 48; *see also id.* at 5.

On December 12, 2014, the Spokane DSHS office received a referral alleging Khaleel had possibly abused G.B. *Id.* at 5. The next day, a Spokane social worker visited Khaleel's Chattaroy home, spoke with her and G.B., and took photographs of him. *Id.* Two days later, another social worker visited Khaleel's home and spoke

with her. *Id.* A few days later, another social worker visited Khaleel's home and interviewed her, her eldest child, and G.B. *Id.* at 56. That social worker also spoke with Kaas, law enforcement officers, the person who made the referral and other staff at G.B.'s school, the Hoh Tribe, and a nurse who examined G.B. *Id.* at 6. Kaas told this social worker that, in July 2014, she conducted a walkthrough of Khaleel's Chattaroy home to determine whether G.B. and his siblings could be placed there. ECF No. 16 at 6; ECF No. 25-6 at 5. After completing the investigation, DSHS closed the abuse referral as unfounded. ECF No. 16 at 6.

After the referral, Stokes learned the Spokane DSHS office had not yet been asked to perform courtesy supervision for G.B. or conduct a home study on Khaleel's Chattaroy home. ECF No. 19 at 3; ECF No. 25-22 at 14–15. The courtesy supervision request was sent shortly after and the Spokane DSHS office approved it on December 23, 2014. ECF No. 16 at 6, 61–62.

In late December 2014, Susan Steiner became G.B.'s new primary social worker in the Port Angeles DSHS office. ECF No. 16 at 6; ECF No. 18 at 2. Steiner reviewed G.B.'s file and saw that the dependency court had placed him with Khaleel in Chattaroy. *Id.* Steiner did not see a request that the Spokane DSHS office perform courtesy supervision for G.B. or conduct a home study on Khaleel's Chattaroy home. *Id.* In late December 2014 or early January 2015, Steiner submitted both requests to the Spokane DSHS office. *Id.*; ECF No. 56 at 15.

On January 27, 2015, the Spokane DSHS office assigned a courtesy social worker for G.B. in Chattaroy while Spokane social worker James Desmond began work on the Khaleel home study. ECF No. 16 at 7; ECF No. 25-18 at 2. The deadline for Desmond to complete the ninety-day home study was April 27, 2015. *See* ECF No. 25-18 at 2–3.

On February 3, 2015, Desmond emailed Steiner and Kirkland with concerns about the Khaleel home study. *Id.* Kirkland forwarded the email to Stokes. ECF No. 25-22 at 20; ECF No. 56 at 16. Desmond said the purpose of the email was to provide "an update as to the status of the home study." ECF No. 25-18 at 2. He explained the information he had so far came from a meeting with Khaleel, a telephone call with her separated husband, and some database research. *Id.* Desmond then described "areas where I will need to get more information from the parties involved before I can write a report." *Id.* He clarified "the information those parties provide in the future might explain the circumstances with no negative concerns." *Id.* After describing his concerns, Desmond reiterated, "I need to have an opportunity to discuss these areas before I can move forward with approving or denying the home study." *Id.* at 3.

By February 18, 2015, Desmond had not received home study paperwork back from Khaleel or her separated husband. *Id.* at 4–5. In an email, Steiner and Desmond discussed the possibility of instituting a relative guardianship, which

would require that Khaleel's Chattaroy home become a licensed foster home and that the children reside in the licensed placement for six months. *Id.* But Desmond announced, "[t]he home as it stands now (Single mother caring for 6 children, several with special needs) is very unlikely to pass a foster home licensing home study." *Id.* at 4. He identified "several other circumstances involved with Cynthia Khaleel which, on first examination, appear to be negative factors." *Id.* Desmond declared, "Unless those are explained in a positive way, it is not likely her placement home study will be approved as it is. This may change after I get information from Cynthia and her husband, but as I said there has not been anything back from them yet." *Id.*

Around February 6, 2015, the dependency court ordered G.B.'s younger half-sister be placed with Khaleel. ECF No. 18 at 3. On February 17, 2015, Spokane social worker Edith Vance conducted a required monthly health and safety visit with G.B. at Khaleel's Chattaroy home. *Id.* at 4. Vance noted concerns about Khaleel's ability to parent six children. *Id.* Vance and her supervisor called Steiner and Kirkland to discuss those concerns. *Id.*; ECF No. 16 at 7–8. Kirkland specifically asked if G.B. was unsafe. ECF No. 16 at 8. Vance expressed no concerns about G.B.'s safety but recommended services be put in place to help Khaleel care for the children. *Id.* Steiner asked the Spokane DSHS office to provide a list of service providers in the area so she could make the appropriate referrals. ECF No. 18 at 4.

On March 3, 2015, Vance entered the following case note regarding her February 17, 2015 visit:

> I was at the home for over two hours and it is chaotic. [G.B.'s younger brother] was in a high chair in the kitchen the whole time I was there, there is so much going on that Cynthia cannot keep up, the children are shuffled to a downstairs playroom while she is upstairs, and when I left, [G.B.] and another young boy were outside with no adult supervision and no fenced yard.
> . . . .
> There are lots of issues and I have concerns that Cynthia is spread too thin with all these children. . . .
> I feel that the aunt's heart is in the right place, but I fear that she is in far above her head and the expectations are too high.

ECF No. 25-15 at 14; *see also id.* at 13.

Meanwhile, Steiner conducted required monthly health and safety visits with G.B. in Port Angeles in January and February 2015, and noted no safety concerns for him. ECF No. 18 at 2–3. Steiner also had two other contacts with G.B. in those months and again noted no safety concerns for him. *Id.* at 3. In March 2015, a Spokane social worker conducted a required health and safety visit with G.B. at Khaleel's Chattaroy home and noted "no observable safety concerns" for G.B. *Id.* at 4–5.

Kirkland supervised Steiner after she became G.B.'s social worker. ECF No. 16 at 6; ECF No. 18 at 2. Kirkland held required monthly supervisor meetings with Steiner in December 2014, and in January, February, and March 2015. ECF No. 16 at 6–8; ECF No. 18 at 3–5. Neither of them noted any safety concerns for G.B. ECF

No. 16 at 6–8; ECF No. 18 at 3–5. G.B. died on April 19, 2015, before the next health and safety visit and supervisor meeting were due to occur. ECF No. 18 at 5.

Other than as Kaas and Steiner's supervisor, Kirkland had no role in this case. ECF No. 16 at 2. While Stokes supervised Oase and Kirkland, he did not supervise Kaas or Steiner. ECF No. 19 at 2. Neither Stokes nor Kirkland ever served as G.B.'s social worker or ever contacted him. ECF No. 16 at 2; ECF No. 19 at 2.

## LEGAL STANDARD

A party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary judgment is appropriate if the record establishes "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

The moving party has the initial burden of showing that no reasonable trier of fact could find other than for the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets its burden, the nonmoving party must point to specific facts establishing a genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

"[A] mere 'scintilla' of evidence will be insufficient to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting *Anderson*, 477 U.S. at 249, 252). If the nonmoving party fails to make such a showing for any of the elements essential to its case as to which it would have the burden of proof at trial, the Court should grant the summary judgment motion. *Celotex*, 477 U.S. at 322.

The Court must view the facts and draw inferences in the manner most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Chaffin v. United States*, 176 F.3d 1208, 1213 (9th Cir. 1999). And, the Court "must not grant summary judgment based on [its] determination that one set of facts is more believable than another." *Nelson v. City of Davis*, 571 F.3d 924, 929 (9th Cir. 2009).

## DISCUSSION

**A.    Stokes and Kirkland are not required parties to Davis's earlier lawsuit.**

Stokes and Kirkland argue the Court should dismiss Davis's present case against them because they were required parties to her earlier lawsuit against DSHS and its employees. ECF No. 13 at 14–16. They note the Court already ruled adversely to Davis in her earlier lawsuit. *Id.* They suggest that they, by virtue of the Court's prior ruling, should not be subject to suit in Davis's present case. *See id.*

Under Federal Rule of Civil Procedure 19(a)(1)(A), "[a] person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if . . . in that person's absence, the court cannot accord complete relief among existing parties."

However, "[i]t has long been the rule that it is not necessary for all joint tortfeasors[3] to be named as defendants in a single lawsuit." *Ward v. Apple Inc.*, 791 F.3d 1041, 1048 (9th Cir. 2015) (quoting *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990)). Indeed, "a tortfeasor with the usual joint-and-several liability is merely a permissive party to an action against another with like liability." *Id* (quoting Fed. R. Civ. P. 19 advisory committee's note to 1966 amendment).

The Court rejects Stokes and Kirkland's argument because they make no meaningful attempt to explain why the Court cannot accord complete relief among existing parties in either Davis's present case or her earlier lawsuit.

Therefore, the Court concludes Stokes and Kirkland were not required parties to Davis's earlier lawsuit against DSHS and its employees. Accordingly, the Court denies their request to dismiss Davis's present case against them.

//

---

[3] "§ 1983 creates 'a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured' to them by the Constitution." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305–06 (1986) (footnote omitted) (quoting *Carey v. Piphus*, 435 U.S. 247, 253 (1978)).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS STOKES AND KIRKLAND'S MOTION FOR SUMMARY JUDGMENT - 14

**B.  Stokes and Kirkland's motion to strike is granted.**

Stokes and Kirkland ask the Court to strike the portions of Dr. A. Monique Burns's declaration opining that they acted with deliberate indifference. ECF No. 35 at 9–10. "An affidavit or declaration used to support or oppose a [summary judgment] motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Under Federal Rule of Evidence 702, "matters of law are inappropriate subjects for expert testimony." *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 337 (9th Cir. 2017) (quoting *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1052 (9th Cir. 2012)). And, under Federal Rule of Evidence 704(a), "an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law." *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)). An expert opinion that a person acted with deliberate indifference is a legal conclusion. *See Pauls v. Green*, 816 F. Supp. 2d 961, 979 (D. Idaho 2011); *Wisler v. City of Fresno*, No. CVF 06-1694 AWISMS, 2008 WL 2880442, at *5 (E.D. Cal. July 22, 2008).

Dr. Burns's declaration does not establish a genuine dispute of material fact regarding deliberate indifference but simply draws a legal conclusion from

undisputed facts. *See* ECF No. 26 at 6, 12–15. Whether undisputed facts establish deliberate indifference is a legal issue within the Court's province at the summary judgment stage. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1059–60 (9th Cir. 2006) (explaining whether undisputed facts establish a violation of a clearly established constitutional right is an "abstract issue of law" for the Court to decide); *Pauls*, 816 F. Supp. 2d at 979 (striking, at the summary judgment stage, an expert opinion that the defendants acted with "deliberate indifference to the rights and safety of the [plaintiffs] in the face of well-known risks"). As such, this is an inappropriate subject for expert testimony.

Moreover, Dr. Burns's declaration does not state the legal standard for deliberate indifference but merely recites a foster child's due process right to social worker supervision and protection from harm inflicted by a foster parent. ECF No. 26 at 5–6, 12–15. Failing to state the legal criteria upon which an expert opinion rests is a sufficient independent reason for the Court to exclude the opinion. *See Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 708–09 (2d Cir. 1989), *cited in* Steven Goode & Olin Guy Wellborn III, *Courtroom Handbook on Federal Evidence* 427 (2018).

Therefore, the Court grants Stokes and Kirkland's request and strikes the portions of Dr. Burns's declaration opining that they acted with deliberate indifference.

**C.** **Stokes and Kirkland are entitled to qualified immunity because they did not act with deliberate indifference to a known or obvious danger to G.B.**

Stokes and Kirkland argue they are entitled to qualified immunity. ECF No. 13 at 7–14. The Court agrees because the undisputed facts do not establish that they acted with deliberate indifference to a known or obvious danger to G.B.

"To establish § 1983 liability, a plaintiff must show both (1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law." *Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1149 (9th Cir. 2011). However, "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether state officials are entitled to qualified immunity, the Court generally applies a two-part inquiry: "First, do the facts the plaintiff alleges show a violation of a constitutional right? Second, was the right 'clearly established' at the time of the alleged misconduct." *Carrillo v. County of Los Angeles*, 798 F.3d 1210, 1218 (9th Cir. 2015) (citation omitted). Here, the first inquiry is dispositive.

"The Fourteenth Amendment substantive due process clause protects a foster child's liberty interest in social worker supervision and protection from harm inflicted by a foster parent." *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833,

842 (9th Cir. 2010). To violate this due process right "state officials must act with such deliberate indifference to the liberty interest that their actions 'shock the conscience.'" *Id.* at 844 (quoting *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006)). "Conduct that 'shocks the conscience' is 'deliberate indifference to a known or so obvious as to imply knowledge of, danger.'" *Id.* (quoting *Kennedy*, 439 F.3d at 1064).

In this context, deliberate indifference requires showing a foster child faced "an objectively substantial risk of harm" and a state official was "subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that either the official actually drew that inference or that a reasonable official would have been compelled to draw that inference." *Id.* at 845. "[T]he subjective component may be inferred from the fact that the risk of harm is obvious." *Id.* (internal quotation marks omitted).

"A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Henry A. v. Willden*, 678 F.3d 991, 1003–04 (9th Cir. 2012) (quoting *Starr v. Baca*, 652 F.3d 1202, 2017 (9th Cir. 2011)). In other words, "[a] supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and

failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

"[W]hen a supervisor is found liable based on deliberate indifference, the supervisor is being held liable for his or her own culpable action or inaction, not held vicariously liable for the culpable action or inaction of his or her subordinates." *Starr*, 652 F.3d at 1207; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own actions, has violated the Constitution."). Thus, in this case, deliberate indifference could either set in motion a chain reaction that leads to § 1983 liability or become the one domino left standing that precludes it.

Here, the undisputed facts do not establish that either Stokes or Kirkland acted with deliberate indifference. The parties mainly dispute whether Stokes and Kirkland violated DSHS policy by failing to timely arrange courtesy supervision and a home study.[4] But that dispute is not material. Assuming, without deciding, that Stokes and Kirkland violated DSHS policy, such conduct does not shock the conscience because it does not reflect any conscious disregard for a known or

---

[4] Davis's reliance on DSHS policy to support her § 1983 claims is misplaced. Davis's § 1983 claims require her to "allege the deprivation of a right secured by the *federal* Constitution or statutory law." *Tamas*, 630 F.3d at 843 (quoting *Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 572 F.3d 685, 692 (9th Cir. 2009)). "Therefore, the alleged violations of state law are not relevant to [the Court's] analysis." *Id.*

obvious danger to G.B. Davis presents no evidence that Stokes or Kirkland either knew of a "substantial risk of serious harm" to G.B. or should have recognized an obvious "substantial risk of serious harm" to him. *See Tamas*, 630 F.3d at 845. Negligence and gross negligence fall short of deliberate indifference. *See id.* at 844 n.10 (quoting *Kennedy*, 439 F.3d at 1064). Thus, Stokes and Kirkland have satisfied their initial burden of showing no reasonable trier of fact could find other than for them and Davis must now point to specific facts establishing a genuine dispute of material fact for trial.

Davis claims Stokes and Kirkland were deliberately indifferent by ratifying G.B.'s placement in Khaleel's Chattaroy home while knowing of Kaas's failures and ignoring Desmond and Vance's concerns. ECF No. 23 at 2, 12, 15–16. Davis argues that, under the circumstances, Stokes and Kirkland should have removed G.B. from Khaleel's Chattaroy home and their failure to do so showed their conscious disregard for a substantial risk of serious harm to him. *See id.* at 16. Davis identifies the risk as "placing [G.B.] with an under investigated and unsupervised caretaker who had a history of [Child Protective Services] violations." *Id.* at 15; *accord id.* at 16. The record does not support Davis's contentions.

First, Davis fails to identify any *obvious* concerns relating to safety—specifically, G.B.'s safety from harm inflicted by Khaleel. In August 2014, the Hoh Tribe approved and the dependency court ordered G.B.'s extended visit at Khaleel's

Chattatory home. ECF No. 17 at 3. In September 2014, the dependency court found Khaleel's Chattaroy home to be "an appropriate placement that adequately meets all [G.B.'s] . . . physical, emotional, cultural, and educational needs," held there was "a continuing need for out-of-home placement for [G.B.] and it would be contrary to [G.B.'s] welfare to return home," and ordered that G.B. be placed with Khaleel in Chattaroy. ECF No. 16 at 3 (alterations and omission in original).

Kaas never documented or voiced any safety concerns for G.B. ECF No. 16 at 2–5; ECF No. 17 at 2–3. Neither Stokes nor Kirkland suspected Kaas was falsifying her case notes. ECF No. 16 at 4; ECF No. 19 at 3. Oase relayed Kaas's problems with timeliness but Kirkland was not initially aware of any concerns that Kaas was documenting events which did not occur. ECF No. 25-21 at 6. Kirkland began supervising Kaas in September 2014—one month after the dependency court ordered G.B. on an extended visit with Khaleel and just two days before the dependency court ordered that G.B. be placed with Khaleel. ECF No. 16 at 2–3. It was not until mid-October 2014 that Kirkland noted a problem with Kaas's case notes. *Id.* at 4.

When, in November or December 2014, Kirkland finally confirmed that Kaas had been falsifying her case notes, he notified Stokes, who launched an investigation and soon removed Kaas from all casework. *Id.* at 5; ECF No. 19 at 3; ECF No. 25-21 at 11. Even after she was caught, Kaas noted no safety concerns with

G.B., his siblings, or Khaleel. ECF No. 16 at 48; *see also id.* at 5.

It was not until mid-December 2014 that Stokes learned Kaas failed to timely arrange courtesy supervision and a home study. ECF No. 19 at 3; ECF No. 25-22 at 14–15. Courtesy supervision for G.B. was approved on December 23, 2014, a courtesy social worker was assigned on January 27, 2015, and a home study began on January 27, 2015. ECF No. 16 at 6–7, 61–62; ECF No. 25-18 at 2. Meanwhile, neither Steiner, Kirkland, nor the courtesy social worker ever documented or voiced any safety concerns for G.B. ECF No. 16 at 6–8; ECF No. 18 at 2–5. The only logical inference is that there were none to be reasonably deduced because they were not obvious at the time.

Second, while DSHS investigated Khaleel three times before G.B.'s death—once based on a referral alleging she had abused G.B. and twice based on referrals alleging she had neglected other children—each time, DSHS deemed the referral unfounded. ECF No. 16 at 6; ECF No. 25-17 at 12; ECF No. 25-18 at 2; ECF No. 25-24 at 15. Because these allegations were unfounded, they did not raise an *obvious* substantial risk of serious harm.

Third, neither Desmond nor Vance's concerns raised an *obvious* substantial risk of serious harm. Even so, the record does not support Davis's assertion that Stokes and Kirkland ignored those concerns.

Desmond provided a status update expressing concerns about the Khaleel

home study. ECF No. 25-18 at 2–5. Twenty-two days into his ninety-day home study, Desmond announced that Khaleel's Chattaroy home was unlikely to pass muster for a variety of reasons. *Id.* at 4. But Desmond prevaricated, saying he was seeking additional information that could change his preliminary assessment. *See id.* Moreover, Desmond did not identify any immediate safety issues regarding Khaleel's Chattaroy home. Considering the tentativeness of Desmond's status update, and the fact that it did not involve safety, his concerns did not raise an obvious substantial risk of serious harm.

Vance expressed concerns about Khaleel's ability to parent six children. ECF No. 18 at 4; ECF No. 25-15 at 13–14. In a conference call addressing those concerns, Kirkland specifically asked if G.B. was unsafe. ECF No. 16 at 8. Vance expressed no concerns about G.B.'s safety but recommended services be put in place to help Khaleel care for the children. *Id.* Steiner asked the Spokane office to provide a list of service providers in the area so she could make the appropriate referrals. ECF No. 18 at 4. Considering the response to Vance's report, and the fact that it did not involve safety, her concerns did not raise an obvious substantial risk of serious harm.

Finally, even if an obvious substantial risk of serious harm had arisen, neither DSHS nor its employees "ha[d] authority to just go in and remove G.B. from [Khaleel's] home." ECF No. 37 at 9. Only the dependency court "had the authority to remove G.B. from [Khaleel's] home." *Id.* And Davis presents no evidence on how

quickly Stokes and Kirkland might have obtained a favorable ruling if they petitioned the dependency court to do so.

Davis fails to establish a genuine dispute of material fact requiring trial. Viewing all evidence and drawing all reasonable inferences in the manner most favorable to Davis, no reasonable trier of fact could find Stokes or Kirkland acted with deliberate indifference to a known or obvious danger to G.B. Thus, Stokes and Kirkland did not personally participate in causing a violation of G.B.'s constitutional rights. Considering all, Stokes and Kirkland are entitled to qualified immunity as a matter of law. Accordingly, the Court grants summary judgment in favor of Stokes and Kirkland on Davis's § 1983 claims against them in their individual capacities.

**D. Stokes and Kirkland's request to stay Davis's state law claims is denied.**

Stokes and Kirkland ask the Court to stay Davis's state law claims pending a decision on an issue of first impression. ECF No. 35 at 7–8. The Court denies this request as moot because the Washington State Supreme Court issued the anticipated opinion on November 1, 2018. *See H.B.H. v. State*, 429 P.3d 484 (Wash. 2018).

Accordingly, **IT IS HEREBY ORDERED**:

1. **Paragraphs 15, 16, 38, 43, and 49** of Dr. A. Monique Burns's declaration, ECF No. 26 at 6, 12–15, are **STRICKEN**.

2. Defendants Tom Stokes and Jeremy Kirkland's Motion for Summary Judgment, **ECF No. 13**, is **GRANTED IN PART** and **DENIED IN**

**PART** as outlined above.

3. The Clerk's Office is directed to **ENTER JUDGMENT** in favor of Defendants Tom Stokes and Jeremy Kirkland on Plaintiff Barbara Davis's 42 U.S.C. § 1983 claims against them in both their official and individual capacities.

**IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** this 29th day of November 2018.

SALVADOR MENDOZA, JR.
United States District Judge